**Rosemary J. MARTIN, Plaintiff–Appellee,**

v.

**CAVALIER HOTEL CORPORATION, Defendant–Appellant,**

**and**

**Daniel P. BATCHELOR, Defendant.**

**Rosemary J. MARTIN, Plaintiff– Appellant,**

v.

**CAVALIER HOTEL CORPORATION; Daniel P. Batchelor, Defendants– Appellees.**

Nos. 94–1600, 94–1666.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1994.

Decided March 10, 1995.

---

**ARGUED:** James A. Gorry, III, Taylor & Walker, P.C., Norfolk, VA, for appellant. John Michael Bredehoft, Charlson & Bredehoft, P.C., Fairfax, VA, for appellees. **ON BRIEF:** Elaine C. Bredehoft, Charlson & Bredehoft, P.C., Fairfax, VA; Carol E. Summers, Clark & Stant, P.C., Virginia Beach, VA, for appellees.

Before RUSSELL and MOTZ, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge RUSSELL and Senior Judge LAY joined.

## OPINION

MOTZ, Circuit Judge:

The principal questions presented in this constructive discharge case are whether the corporate employer is responsible for the acts of its vice president and general manager and, if so, whether the plaintiff-employee produced sufficient evidence that her employer intended to force her to resign. Because we conclude that the district court was correct in determining that the answer to both questions is yes, and because there is no other basis for reversal, we affirm.

### I.

On February 24, 1993, Rosemary Martin filed a twelve-count complaint against Cavalier Hotel Corporation and its General Manager, Daniel Batchelor, charging them with sexual harassment and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and various state law claims. The district court bifurcated the jury trial for liability and damages purposes. At the conclusion of evidence in the liability phase, the court granted the defendants' motions for judgment on most of the state law claims. The defendants' motions for judgment as to the remaining claims were denied, and the claims were submitted to the jury. The jury found against Martin on her claims of sexual harassment, wrongful termination, and intentional infliction of emotional distress. The jury found in favor of Martin, against Batchelor, on her claim of common law assault and battery, and in favor of Martin, against Cavalier, on her claim of constructive discharge. The jury subsequently returned for the damages phase of the case, received evidence, and awarded Martin $30,000 compensatory damages and $50,000 punitive damages against Cavalier, and $7,000 compensatory damages and $15,000 punitive damages against Batchelor.. Both Cavalier and Batchelor moved for judgment n.o.v.,[1] which the district court denied. The district court awarded Martin $22,320 in back pay and certain attorney's fees and costs. Cavalier appeals from the district court's denial of its motion for judgment n.o.v. and from the award of back pay, attorney's fees, and costs. Martin cross-appeals as to the amount of attorney's fees and costs awarded. Batchelor did not file an appeal.

The following is a summary of the relevant evidence supporting the jury's verdict. Cavalier Hotel Corporation operates the Cavalier Hotel, located in Virginia Beach, Virginia, and employs approximately 500 employees during the summer season and approximately 250 employees during the remainder of the year. Martin began working at the Cavalier in April, 1987 as a cashier and was promoted to director of payroll and personnel approximately one year later; she served in that capacity until her resignation in 1992. By all accounts Martin was a competent employee, the recipient of at least two "Employee-of-the-Month" awards during her service at the hotel. Batchelor had worked at the Cavalier for eighteen years prior to trial, holding various positions of increasing responsibility at the hotel. In 1987 he became an officer of the Cavalier Hotel Corporation; in December, 1989 he was made the General Manager of the hotel, a corporate Vice President, and one of the four members of the corporation's Board of Directors. At that time he also became Martin's direct supervisor. Batchelor had, and has, full authority to determine employee bonuses and to hire, fire, promote, and discipline employees at the hotel. Moreover, the Cavalier Employee Handbook, which prohibits sexual discrimination, harassment, and abuse in the workplace, provides

---

1. Fed.R.Civ.P. 50 was amended in 1991 to eliminate the terms "directed verdict" and "judgment notwithstanding the verdict (judgment n.o.v.)"; both are now simply designated as "judgment as a matter of law." We use "judgment n.o.v." throughout because that is the terminology used by the judge and parties in the district court and employed in many of the cases upon which we rely within.

that all complaints as to such acts are to be reported to Batchelor.

Nobody was "above" Batchelor at the Cavalier except the other three members of the Board of Directors, which included its Chairman, Gene Dixon, and Dixon's wife. Dixon's family controlled the corporation that owned the hotel. The Dixons lived three hours away from the hotel most of the year but stayed on the hotel property for "parts of July and August." In the past twenty years, Dixon had attended only one of the hotel's weekly senior staff meetings. He did not remember ever having a conversation with Martin and did not know her job title prior to trial. Neither his name nor his office or home telephone numbers are listed in the Employee Handbook. Dixon testified that after this lawsuit was filed, he never made any inquiry as to its merits or asked Batchelor if he had done "what he's accused of." By Dixon's own account, his investigation of Martin's charges consisted of walking around the hotel property and looking "in people's eyes [to] see whether they have anything—I believe I can tell when people want to talk."

At trial, Batchelor categorically denied ever harassing or assaulting Martin. In contrast, Martin testified about a number of times, beginning in 1988, that Batchelor harassed and assaulted her. The first two incidents occurred in 1988 or early 1989, when on one occasion Batchelor attempted to kiss Martin and on another he nudged her and told her he wanted to take her to a hotel and "stick something between her legs." The abuse escalated in 1992. In February of that year, Batchelor called Martin into his office, placed a "Meeting in Progress" sign on his office door, locked it, put his hand over her mouth to prevent her from screaming, and committed oral and anal sodomy on her. During the attack, Martin "cried like a baby." At the beginning of March, Batchelor asked Martin to remain after a regularly scheduled senior staff meeting in one of the hotel conference rooms, locked the door, and forced her to engage in oral sex. Martin submitted to Batchelor's demands because "[w]hen he tells you to do something, you do it or else." When abusing her, Batchelor

assertedly told Martin that "if I didn't obey him, that I could pack my stuff and leave." At the end of March, Batchelor raped Martin. On another occasion he forced her to lick his penis in the hotel's accounting office. Martin did not tell anyone about the abuse because "if I would have told anybody, I would have got fired [sic]....[H]e would have fired me if I would have said anything."

Martin finally decided that she "couldn't handle what he was doing to me" and resigned in May, 1992. After resigning, Martin travelled to Maryland to live with her sister, where she was unable to work for several months. Martin has been diagnosed with depression and posttraumatic stress disorder and suffers from nightmares, insomnia, and severe weight loss assertedly as a result of her experiences at the Cavalier Hotel.

Martin testified that before the effective date of her resignation, she told her successor, the incoming personnel manager, that Batchelor had sexually harassed her. At trial, the new personnel director confirmed that Martin had confided this to him but testified that he took no action because he did not believe Martin. Before resigning, Martin also told another hotel employee about the harassment. She did not report the harassment to Dixon, explaining that even though she periodically saw Dixon and his wife on the hotel property and mailed him bi-weekly financial reports, Batchelor was the General Manager of the hotel and had total authority over all employees. She felt it was useless to report Batchelor's conduct to Dixon and his wife because they treated Batchelor "like a son [and] wouldn't believe anything that I would have to say." When Martin informed Batchelor of her intent to resign, "[h]e just looked and snickered. He didn't say anything." When she attempted to explain why she was leaving, "he just snickered again and turned his head."

## II.

Cavalier's principal contention is that the district court erred in denying its motion for judgment n.o.v. on Martin's claim for constructive discharge.[2] In reviewing the

---

**2.** Cavalier suggests that the jury instructions were incorrect in certain respects, but it express-

denial of a motion for judgment n.o.v., an appellate court must view "all of the evidence in the light most favorable to [the non-moving party], drawing all reasonable inferences in [that party's] favor...." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1412 (4th Cir.1992). If there is "substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party, the motion should be denied...." *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir. 1980). An appellate court is expressly prohibited from weighing the evidence or assessing the credibility of witnesses. *Taylor v. Home Ins. Co.*, 777 F.2d 849, 854 (4th Cir. 1985), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986).

■ To recover under a theory of constructive discharge, a plaintiff must show that his or her *"employer deliberately* ma[de] an employee's working conditions intolerable and thereby force[d] him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (emphasis added) (quoting *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985)). In support of its claim that the district court erred in denying its motion for judgment n.o.v. on the constructive discharge claim, Cavalier makes two arguments. First, it claims that Batchelor's

harassment and abuse of Martin fell outside the scope of Batchelor's employment relationship with Cavalier and was done without notice to Cavalier, and so cannot be attributed to Cavalier. Second, even if Batchelor's conduct can be imputed to Cavalier, the hotel asserts that there was insufficient evidence from which a jury could conclude that this conduct demonstrated an intention to force Martin to quit, and so does not establish that she was constructively discharged. We address each argument in turn.

### A.

In urging us to relieve it of liability for Batchelor's conduct here, Cavalier does not contend that an employer cannot be held liable for harassing or abusive conduct by its supervisor that assertedly causes an employee to quit. Rather, Cavalier's contention is only that it is not *automatically* liable for Batchelor's actions. Relying on the Supreme Court's decision in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and its progeny, the hotel maintains that here, as in the hostile work environment context, a court should look to traditional common law agency principles for guidance in determining whether Batchelor's conduct is imputed to Cavalier.

In *Meritor*, a bank employee alleged that over a period of years her employer's vice president had repeatedly made demands for sexual favors from her. The plaintiff testified that because she feared for her job and her safety, she never reported the harass-

ly disavows any claim that it appeals on this basis. Perhaps this is because Cavalier never moved for a new trial but only for judgment n.o.v., which has been held "not the correct remedy for erroneous jury instructions. The proper remedy is a new trial." *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir.1992). A motion for judgment n.o.v. only preserves a claim that the evidence was "insufficient to support a judgment for the plaintiff *even under the proper instructions." Id.* (emphasis added). Similarly, Cavalier does not argue but mentions in passing that "arguably Martin's verdict should be set aside as inconsistent." In denying the motion for judgment n.o.v., the district court noted that the verdicts were not necessarily "inharmonious," but rather reflected "a factor of pragmatism," *see Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 483–85, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933); *City of Richmond,*

*Va. v. Madison Management Group, Inc.*, 918 F.2d 438, 458 (4th Cir.1990), and that "defendants did not raise the issue of an inconsistent verdict ... at the time of trial," or move for a new trial, "which would be the proper relief if the jury's findings were deemed irreconcilable." *See White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir.1989). Because Cavalier does not advance before us any argument that these asserted errors provide grounds for reversal, we do not consider them. *See Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 514 n. 8, 94 S.Ct. 2449, 2455 n. 8, 41 L.Ed.2d 270 (1974); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 334 n. 10, 83 S.Ct. 1715, 1726 n. 10, 10 L.Ed.2d 915 (1963) (argument "not ... developed with any fullness" will not be considered but rather regarded as "abandoned"); *Schroepfer v. A.S. Abell Co.*, 138 F.2d 111, 116 (4th Cir.1943), *cert. denied*, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944).

ment to her supervisors, nor did she attempt to avail herself of the bank's grievance procedures. The district court held that the bank was not liable for the acts of its vice president because, since the plaintiff had never reported the harassment or employed the bank's grievance procedures, the "bank was without notice" of the harassment. 477 U.S. at 62, 106 S.Ct. at 2403. The Court of Appeals reversed, holding that the bank was "absolutely liable for sexual harassment practiced by supervisory personnel...." *Id.* at 63, 106 S.Ct. at 2403. The Supreme Court rejected the approach of both lower courts, concluding that it was error to hold either that "employers are *always automatically liable* for sexual harassment by their supervisors" or that "*absence of notice* to an employer ... *necessarily insulate[s] that employer* from liability." *Id.* at 72, 106 S.Ct. at 2408 (citing Restatement (2d) of Agency §§ 219–37 (1958)) (emphasis added). With regard to the latter point, the Court specifically rejected the bank's contention that "the mere existence of a grievance procedure and a policy against discrimination, coupled with [the plaintiff's] failure to invoke that procedure," insulated the bank from liability for the discriminatory acts of its supervisor. *Id.* The Court directed that in hostile work environment cases, "Congress wanted courts to look to agency principles for guidance in this area." *Id.* It is this same application of "agency principles" that Cavalier urges is determinative here.

■ Assuming, without deciding, that Cavalier is correct that these common law agency principles establish the proper standard for determining its liability for Batchelor's acts,[3] we turn to an examination of these principles in the context of this case. An employer is liable at common law for the wrongful acts of an employee that take place within the scope of the employee's employment. *See, e.g., Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 249 Va.

39, 453 S.E.2d 261 (1995) (reversing summary judgment ruling that employer was not liable because employee was not acting within scope of employment). It is the employer's burden to show that the employee "was not acting within the scope of his authority when he committed the acts complained of, and, if the evidence leaves the question in doubt, it becomes an issue for determination by a jury." *Id.* 453 S.E.2d at 265. A determination of whether an employee's acts are within the scope of his employment requires an examination of *when* the act took place, *where* it took place, and whether it was *foreseeable. See generally* Restatement (2d) of Agency §§ 210–45 (1958).

■ An employer may be liable for an employee's acts even if the employee's motive is to benefit the employee, to "advance his self-interest, rather than the interest of [his employer]." *Bellsouth,* at 266; *see also Bryant v. Bare,* 192 Va. 238, 64 S.E.2d 741, 745 (1951). A "forbidden" or even "consciously criminal or tortious" act may still be within the scope of employment. Restatement (2d) of Agency §§ 230, 231, 235–36; *see, e.g., Tri–State Coach Corp. v. Walsh,* 188 Va. 299, 49 S.E.2d 363, 367 (1948). Indeed, an employer may be liable for its employee's unauthorized use of force if such use was foreseeable in view of the employee's duties. Restatement (2d) of Agency § 245; *see, e.g., Davis v. Merrill,* 133 Va. 69, 112 S.E. 628, 631 (1922) (upholding jury verdict finding employer liable for its employee gate keeper's malicious shooting of another). "[T]he test of the liability of the [employer] for the tortious act of the [employee] is not whether the tortious act itself is a transaction within the ordinary course of the business of the [employer], or within the scope of the [employee's] authority, but whether the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such authority." *Davis,* 112 S.E. at 631 (citing *Henry Myers*

---

**3.** The district court concluded that because "the evidence at trial ... would have sustained the jury's decision that Cavalier bore responsibility for Batchelor's acts ... by means of a *quid pro quo* situation," Cavalier was "automatically liable" for Batchelor's actions. Cavalier recognizes that in *quid pro quo* sexual harassment cases an

employer is automatically liable for its supervisor's conduct, *see, e.g., Spencer v. General Elec. Co.,* 894 F.2d 651, 658 n. 10 (4th Cir.1990) (citing U.S.C. § 2000e(b)); *Katz v. Dole,* 709 F.2d 251, 255 n. 6 (4th Cir.1983); Cavalier simply asserts that this standard does not apply in this case.

& Co. v. Lewis, 121 Va. 50, 92 S.E. 988 (1917)); accord Bellsouth, 453 S.E.2d at 265.[4]

Here Batchelor's assaults took place in the workplace, during working hours, on an employee whom he had authority to hire, fire, promote, and discipline. There is no question that such sexual assaults were foreseeable; had they not been, Cavalier would not have had a policy in its Employee Manual specifically prohibiting them and providing for a procedure to complain about them. Thus, under common law agency principles, Batchelor was acting within the scope of his employment with Cavalier, and so Cavalier is liable for Batchelor's assaults on Martin. To be sure, like the conduct at issue in Tri–State Coach, Davis, and Bellsouth, Batchelor's assaults on Martin were "outrageous and violative of his employer's rules." Bellsouth, 453 S.E.2d at 266. Nonetheless, those assaults arose out of Batchelor's management of the hotel, just as the assault by the employee in Tri–State Coach arose out of his duties in "operation of the bus," Tri–State Coach, 49 S.E.2d at 367, and the killing by the employee in Davis arose out of his duties in "raising and lowering gates." Davis, 112 S.E. at 631. At the very least, because Batchelor's "willful and malicious acts were committed while [he] was performing his [employment] duties," there is here, as there was in Bellsouth, sufficient evidence to present a "jury issue" as to whether Batchelor was acting "within the scope of his employment" with Cavalier. See Bellsouth, 453 S.E.2d at 266.

Moreover, under common law agency principles an employer is also liable for an employee's wrongful acts, even if those acts are not committed within the actual scope of his employment, if the employee uses his apparent authority to accomplish the wrongful acts and so is acting within the "apparent scope" of his employment. See, e.g., Kavanaugh v. Wheeling, 175 Va. 105, 7 S.E.2d 125, 129 (1940); Hines v. Gravins, 136 Va. 313, 112 S.E. 869, 871–72 (1922) (employer

liable for agent's slanderous words where "there can hardly be any fair doubt that [the agent] was acting within the apparent scope of his authority" (emphasis added)), cert. denied, 265 U.S. 583, 44 S.Ct. 458, 68 L.Ed. 1191 (1924). "[T]he tort of an agent is within the course of his employment where the agent in performing it is endeavoring to promote his principal's business within the scope of the actual or apparent authority conferred upon him for that purpose; but the act may be within the scope of the agent's authority, and yet not be in the interest of the principal or in the prosecution of the principal's business." Tri–State Coach, 49 S.E.2d at 366 (quoting 3 C.J.S. Agency § 255) (emphasis added); see also Karibian v. Columbia University, 14 F.3d 773, 780 (2d Cir.1994) (applying common law agency principles, the court held that "an employer is liable ... if the supervisor uses his actual or apparent authority to further the harassment" (emphasis added)).

There was abundant evidence both that Batchelor was vested by Cavalier with enormous actual and apparent authority and that he used this authority to accomplish the wrongful acts here. Batchelor was not just a corporate officer of Cavalier; he was the hotel's General Manager and a member of its four-person Board of Directors. It is undisputed that Batchelor managed all hotel employees, with full authority to hire, fire, promote, and discipline them. Dixon, the Chairman of the Board of Directors, lived on the hotel property during a portion of the summer months and visited it on other occasions, but he did not maintain a permanent presence there. He delegated management responsibilities entirely to Batchelor, attending only one senior staff meeting during his twenty-year tenure with the hotel. Company policy required complaints to be directed to Batchelor, and no other grievance process, formal or otherwise, was made available to employees. Moreover, Martin specifically

---

4. The two cases upon which Cavalier heavily relies, Allen Realty Corp. v. Holbert, 227 Va. 441, 318 S.E.2d 592 (1984), and Fulwiler v. Peters, 179 Va. 769, 20 S.E.2d 500 (1942), are inapposite. Neither involved a claim by a third party against a principal arising out of the acts of an agent. Rather, in those cases the question was whether the knowledge of a dishonest agent, acting adversely to his principal, should be imputed to the principal, and so permit the agent to fraudulently convey property, see Fulwiler, 20 S.E.2d at 503, or bar a cause of action by the principal against third parties, Allen, 318 S.E.2d at 594–95. There is no similar claim here.

testified that Batchelor relied upon the authority vested in him by Cavalier to coerce her to comply with his demands. Batchelor assertedly told Martin that if she failed to submit to him she would lose her job, and Martin testified that she knew that if she had reported Batchelor's conduct to anyone she would have been fired.

 Under these circumstances, Cavalier must be held liable for Batchelor's actions. As Judge Posner observed in *Hunter v. Allis–Chalmers Corp.*:

> Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act. Whether *his* supervisors know or should have known what he did is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level.

797 F.2d 1417, 1422 (7th Cir.1986) (dicta) (citations omitted) (emphasis in original); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994) ("In supervisor sexual harassment cases, an individual who is acting as an employer's 'agent' is deemed the alter ego of the employer and the employer is liable...."); *Karibian*, 14 F.3d at 780 ("[a]t some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company." (quoting *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*, 957 F.2d

59, 64 (2d Cir.1992))); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) (county liable for county attorney's conduct where county attorney had "ultimate authority over [plaintiff's] employment and working conditions"; "[i]n such a situation, the individual operates as the alter ego of the employer...."); *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir.1983) ("once the plaintiff in [a sexual harassment] case proves that harassment took place, the most difficult legal question typically will concern the responsibility of the employer for that harassment. *Except in situations where* a proprietor, partner or corporate officer participates personally in the harassing behavior, the plaintiff will have the additional responsibility of demonstrating the propriety of holding the employer liable under some theory of respondeat superior." (dicta) (emphasis added)).[5]

**B.**

Even if it is liable for Batchelor's assaults on Martin, as we have held it is, Cavalier contends that the district court erred in denying its motion for judgment n.o.v. on Martin's claim for constructive discharge because there was assertedly insufficient evidence from which a reasonable jury could find that Batchelor intended to force Martin to quit. Cavalier argues that the evidence adduced at trial instead demonstrates that Batchelor desired Martin to remain employed at the hotel so that he could continue to assault her, and that for this reason Cavalier was entitled to judgment as a matter of law.

As noted above, it is well established that an employee is entitled to relief under Title VII, even absent a formal discharge, if an

---

5. Moreover, there is a third basis for holding Cavalier responsible for Batchelor's acts. Given Batchelor's status in Cavalier's corporate hierarchy and his total managerial control over the hotel, Batchelor's actual notice of the conduct giving rise to Martin's constructive discharge effectively put Cavalier on notice of this conduct. *See Levendos v. Stern Entertainment, Inc.*, 909 F.2d 747, 751–52 (3d Cir.1990) ("the actions of *and notice to* [the individual defendants], as supervisory employees and agents, may be imputed to [the corporate employer]" (citing *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408) (emphasis added)); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 875–77 (9th Cir.1989) (applying "traditional agency/employer-employee principles" to "hand-

icap discrimination" case, court held that "if notification is given to an agent who has, or appears to have authority either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it, then such notice is chargeable to the principal" (citations and internal quotations omitted)), *cert. denied*, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990); *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 80–81 (3d Cir.1983) (imputing knowledge to an employer in situation "in which an offending supervisor has unbridled authority to retaliate against an employee.... To hold otherwise would vitiate the reference to 'constructive notice' ... and would lead to incongruous results.").

employer "deliberately" makes the "working conditions" of the employee "intolerable" in an effort to induce the employee to quit. *Bristow,* 770 F.2d at 1255; *see also Ugalde v. W.A. McKenzie Asphalt Co.,* 990 F.2d 239, 242–43 (5th Cir.1993) ("The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has committed a construction discharge...."). Thus, in order to demonstrate constructive discharge, a plaintiff must allege and prove two elements: (1) "deliberateness of the employer's actions" and (2) "intolerability of the working conditions." *Paroline v. Unisys Corp.,* 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., dissenting), *vacated in part,* 900 F.2d 27 (1990) (*en banc*) (adopting panel dissenting opinion); *see also Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 52, 130 L.Ed.2d 12 (1994); *EEOC v. Clay Printing Co.,* 955 F.2d 936, 941–46 (4th Cir.1992). Cavalier does not claim that Martin failed to demonstrate intolerable working conditions; such an argument would be baseless. Instead, Cavalier focuses solely on the first element, *i.e.,* the adequacy of Martin's proof as to her employer's "deliberateness."

■ The circuits are divided as to what a plaintiff must show in order to prove this element. *See generally* Barbara Lindemann and David D. Kadue, *Sexual Harassment in Employment Law* 259 (1992). The majority of the circuits focus almost exclusively on the effect an employer's actions have on an employee and rely on an objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign. *See, e.g., Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360–61 (2d Cir.1993) (ADEA claim); *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987) (Title VII racial discrimination claim); *Garner v. Wal–Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987); *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986) (ADEA claim); *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986); *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 887–88 (3d Cir.1984); *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61, 65 (5th

Cir.1980). The minority view, to which we subscribe, is that a plaintiff must also prove that "the actions complained of were intended by the employer as an effort to force the employee to quit." *Paroline,* 879 F.2d at 114 (Wilkinson, J., dissenting) (internal quotations omitted); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981) (Title VII racial discrimination claim).

■ Cavalier seeks to capitalize on the fact that evidence of the employer's intent is required in this Circuit. The hotel suggests that under that standard a plaintiff must introduce specific, direct evidence that the employer "wanted her gone, wanted her off the job, and deliberately set about trying to make her life so intolerable that she had no reasonable alternative but to quit." However, this argument ignores the fact that neither we nor any other court that has required evidence of "deliberateness" have ever "insisted on 'smoking gun' evidence of employer intent." Sheila Finnegan, Comment, *Constructive Discharge Under Title VII and the ADEA,* 53 U.Chi.L.Rev. 561, 568 (1986). Nor could we. *See United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983) (In a Title VII action, "[a]s in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.... [T]he District Court should not have required [the Title VII plaintiff] to submit direct evidence of discriminatory intent."). Rather, as Judge Wilkinson explained in *Paroline,* an employer's intent can be proved by "inference." 879 F.2d at 114. For example, evidence that the employer failed "to act in the face of known intolerable conditions" and did not treat all employees "identically" may create an "inference that the employer was attempting to force the plaintiff to resign...." *Id.; see also Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994) ("Deliberateness can be proven by actual or circumstantial evidence, including evidence of actions that single out a plaintiff for differential treatment." (citation and internal quotations omitted)); *Johnson v. Shalala,* 991 F.2d at 131 (same).

■ Similarly, in assessing the deliberateness of an employer's conduct, "an employer 'must necessarily be held to intend the reasonably foreseeable consequences of its actions.'" *Troutt v. Charcoal Steak House, Inc.*, 835 F.Supp. 899, 902 n. 4 (W.D.Va.1993) (quoting *Hukkanen v. International Union of Operating Engineers*, 3 F.3d 281, 284 (8th Cir.1993)), *aff'd mem.*, 37 F.3d 1495 (4th Cir.1994). In a case with similar though less egregious facts than the one at hand, the Eighth Circuit recently held that an employee's decision to quit was a "reasonably foreseeable consequence" of her supervisor's abuse, and so evidenced the requisite intent to force the employee to quit. *See Hukkanen*, 3 F.3d at 285. There, as here, a managing officer of the defendant sexually harassed a woman who worked for him; rather than actually raping the plaintiff, however, the officer in *Hukkanen* only threatened to rape her. There, again as here, the employee quit her job and brought an action under Title VII for constructive discharge. After a finding in the plaintiff's favor, the employer appealed, arguing that its officer's "harassment was intended to extract some sort of sexual favor from [the plaintiff] or to provide a perverse sort of amusement rather than to force her to resign" and so did not constitute an adequate basis for a constructive discharge claim. *Id.* at 284. Cavalier's virtually identical argument here is that Martin has failed to prove constructive discharge because "Batchelor would have preferred [Martin] to remain at the hotel so he could continue to perpetrate and execute his lascivious acts" on her.

■ The Eighth Circuit categorically rejected this argument, characterizing it as "bizarre." Citing *Johnson v. Bunny Bread*

*Co.*, 646 F.2d at 1256, the *Hukkanen* Court reaffirmed that the Eighth Circuit's constructive discharge standard, like that of the Fourth Circuit, requires a showing of employer intent. *Id.* However, the *Hukkanen* Court properly recognized that proof of an employer's intent "does not mean constructive discharge plaintiffs must prove their employers consciously meant to force them to quit. When an employer denies a conscious effort to force an employee to resign ... the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions." *Id.* (citations omitted). Thus, if "[the plaintiff's] resignation was a reasonably foreseeable consequence" of the harassment of the defendant's officer, those "actions were necessarily taken with the intention of forcing [the plaintiff] to quit." *Id.* at 285.[6] Applying this standard, the Eighth Circuit concluded that the plaintiff in *Hukkanen* had produced sufficient evidence that her resignation was a "reasonably foreseeable consequence of [the defendant's] conduct." *Id.*

■ Precisely the same conclusion is compelled here. A hotel employee's resignation is surely a "reasonably foreseeable consequence" of repeated assaults by the hotel's general manager. Cavalier does not argue to the contrary. What Cavalier does claim, heavily relying on *Paroline*, is that to permit a plaintiff to demonstrate constructive discharge by evidence that her resignation was the "reasonably foreseeable consequence" of her employer's conduct is contrary to this Circuit's "deliberateness" requirement. That argument ignores the very underpinning of the intent requirement and constitutes a severe misreading of *Paroline*.[7]

---

6. In so holding, the *Hukkanen* Court noted:

> To hold otherwise would draw an irrational distinction among discrimination victims who reasonably feel forced to quit: employees who are discriminated against because their employer wants them to quit could prove a constructive discharge, while employees like [the plaintiff] who are discriminated against because of their employers' ongoing pursuit of sexual gratification could not.

*Id.* at 284–85. We agree. This sort of distinction between discrimination victims would, contrary to the clear purpose of Title VII, effectively con-

vert sexual harassment from a species of prohibited conduct to a viable defense in such suits.

7. It also ignores the fact that, as explained above, the Eighth Circuit, like the Fourth Circuit, requires evidence of employer intent. Thus, we have repeatedly relied on precisely the same Eighth Circuit precedent, *Johnson v. Bunny Bread Co.*, 646 F.2d at 1256, as the *Hukkanen* Court did. *See, e.g., Johnson v. Shalala*, 991 F.2d at 131; *Clay Printing Co.*, 955 F.2d at 944; *Paroline*, 879 F.2d at 114 (Wilkinson, J., dissenting); *Bristow*, 770 F.2d at 1255. Moreover, the *Hukkanen* Court was aware of, and indeed specifical-

In formulating the requirement that in a Title VII constructive discharge case an employee must demonstrate the employer's intent to force the employee to quit, we have looked to constructive discharge cases decided under § 8(a)(3) the National Labor Relations Act, 29 U.S.C. § 158(a)(3). *See, e.g., English v. Powell*, 592 F.2d 727, 731 n. 4 (4th Cir.1979) (doctrine of constructive discharge "had its genesis in the labor relations area but has been extended and held applicable to civil rights claims" (citations omitted)). Only where an "employer *deliberately* makes an employee's working conditions intolerable and thereby forces him to quit his job because of union activities" has an employer "constructively discharged the employee in violation of § 8(a)(3) of the Act." *J.P. Stevens & Co., Inc. v. NLRB*, 461 F.2d 490, 494 (4th Cir.1972) (emphasis added). Because we have concluded that the elements of a constructive discharge formulated under the National Labor Relations Act are equally applicable in the Title VII context, we require a Title VII plaintiff asserting constructive discharge similarly to prove the employer's intent to force the plaintiff to quit. *Holsey*, 743 F.2d at 209; *see also Bristow*, 770 F.2d at 1255. The Supreme Court, however, has long held that " *specific* evidence of intent ... is *not* an indispensable element of proof of violation of § 8(a)(3)" of the National Labor Relations Act. *Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 44, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954) (emphasis added). Indeed, it has explicitly held that an employer's intent can be proved by evidence that an employee's resignation was "the foreseeable consequence[ ] of [the employer's] conduct." *Id.* at 45, 74 S.Ct. at 338. As the Court observed in *Radio Officers' Union:*

*This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common-law rule that a man is held to intend the foreseeable consequences of his conduct.* Thus an employer's protestation that he did not intend to encourage or discourage must be unavailing where a natural consequence of his action was such encouragement or discouragement. Concluding that encouragement or discouragement will result, it is presumed that he intended such consequence.

*Id.* at 45, 74 S.Ct. at 338. (citations omitted) (emphasis added); *see also NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227, 83 S.Ct. 1139, 1144–45, 10 L.Ed.2d 308 (1963); *International Broth. of Elec. Workers, Local 211 v. NLRB*, 821 F.2d 206, 210–11 (3d Cir.1987); *Olin Mathieson Chem. Corp. v. NLRB*, 232 F.2d 158, 161 (4th Cir.1956), *aff'd*, 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed.2d 562 (1957). Thus, contrary to Cavalier's argument, permitting a plaintiff to prove her employer's intent by demonstrating that her resignation was the "reasonable foreseeable consequence" of the employer's conduct is in accordance with, indeed mandated by, the approach adopted by this Circuit in Title VII cases.

Nor, despite Cavalier's claims, is *Paroline* to the contrary. In *Paroline,* Judge Wilkinson did not employ the words "reasonably foreseeable consequences," but there was no reason to do so; there is certainly nothing in *Paroline* that even suggests such an approach would be improper. Rather, the *Paroline* analysis is entirely consistent with holding an employer responsible for the "reasonably foreseeable consequences" of his conduct.[8] In *Paroline,* a fellow employee alleg-

---

ly relied on, Judge Wilkinson's observations in *Paroline. See Hukkanen,* 3 F.3d at 285 (citing *Paroline,* 879 F.2d at 114 n. 2).

8. Mindful that "[b]ecause the claim of constructive discharge is so open to abuse by those who leave employment of their own accord," it should be "carefully cabined," *Paroline,* 879 F.2d at 114 (Wilkinson, J., dissenting), we nevertheless recognize that often when a plaintiff has proved that a "reasonable person" in her position would have felt compelled to resign, she will have also demonstrated the requisite employer intent, *e.g.,*

that her resignation was the "reasonably foreseeable consequence" of her employer's conduct. *See Hukkanen,* 3 F.3d at 285 (recognizing that "the same evidence is involved [under both standards] and the constructive discharge finding is the same"). Indeed, to reach any other conclusion here would be inconsistent with Judge Wilkinson's observation in *Paroline* that the ultimate "result" under both the majority rule and the employer deliberateness requirement adopted by us and the Eighth Circuit is "the same." *Paro-*

edly made "improper sexual advances" to the plaintiff "both on and off the job." 879 F.2d at 102. However, unlike in *Hukkanen* or the present case, there was no evidence in *Paroline* that the plaintiff's resignation was "reasonably foreseeable." Instead, when the plaintiff complained to management, the employer ordered the offending employee to seek counselling, placed a memorandum setting forth the conditions of his continued employment in his personnel file, delayed his planned promotion and salary increase, limited his contact with female employees, and told him that if there were any more incidents he would be fired. *Id.* at 114 (Wilkinson, J., dissenting). Furthermore, the defendant employer specifically asked the plaintiff not to quit, gave her two weeks off in which to recuperate, and offered to pay for her counselling. *Id.* In sum, there was no evidence in *Paroline* that the plaintiff's resignation was the reasonably foreseeable consequence of the defendant's conduct.

■ Finally, even if we were to conclude that evidence that an employee's resignation was a "reasonably foreseeable consequence" of a defendant's harassment does *not* demonstrate the requisite employer intent to force the employee to quit, we would nevertheless conclude that there was sufficient evidence of such intent here. Of course, there was some evidence, notably Batchelor's testimony, that Batchelor did not want Martin to quit and would have rehired her. But, viewing all of the evidence in the light most favorable to Martin, and drawing all reasonable inferences in her favor, as we must, there was also legally sufficient evidence from which a jury could have found that Batchelor, and thus Cavalier, acted with the intent to force Martin to quit. For example, Martin testified that she followed Batchelor's orders because "[w]hen he tells you to do something, you do it or else," and that "if I would have told anybody, I would have got fired [sic]." Martin also testified that during another incident, Batchelor told her "that if I didn't obey him, that I could pack my stuff and leave." Martin further testified that when she informed Batchelor that she was resigning, "[h]e just looked and snickered. He didn't

say anything," and that when she tried to explain why she was leaving, "[Batchelor] just snickered again and turned his head." There was no evidence that the employer here took *any* remedial measures, let alone the extensive measures taken by the employer in *Paroline*, when confronted with the plaintiff's complaints; rather, when Martin cried, Batchelor told her to succumb or be fired, and when she resigned, he snickered. Moreover, there is no evidence that Batchelor treated other employees in a similar fashion. Thus, in contrast to *Paroline*, this is not a situation where "[t]he fact that all employees were treated identically rebut[ted] any inference that the treatment of the plaintiff was done 'with the intention of forcing [the plaintiff] to resign....'" *Id.* (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d at 1256).

In sum, there was sufficient evidence to hold Cavalier responsible for Batchelor's acts and to find that those acts demonstrated the employer's intention to force Martin to quit. The district court did not err in denying Cavalier's motion for judgment n.o.v.

### III.

■ Cavalier also contends that the district court erred with respect to certain of its evidentiary rulings and by denying Cavalier's motions for mistrial. The trial judge's admission or exclusion of evidence is reviewed for abuse of discretion, *Martin v. Deiriggi*, 985 F.2d 129, 137 (4th Cir.1992); *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1187 (4th Cir.1990), as is his denial of a motion for mistrial. *Bright v. Coastal Lumber Co.*, 962 F.2d 365, 370–71 (4th Cir. 1992) (citing *Maxworthy v. Horn Elec. Serv., Inc.*, 452 F.2d 1141, 1144 (4th Cir.1972)).

■ Cavalier argues first that the district court erred by excluding from evidence a report prepared by the Virginia Employment Commission that concluded that Martin was not entitled to unemployment benefits because she left her job with the hotel voluntarily. The district court held that the report was inadmissible because of the prejudicial effect such an official report might have

*line*, 879 F.2d at 114 n. 2 (Wilkinson, J., dissent- ing).

on the jury and because of the availability of the parties to the report to testify at trial. However, the court permitted Cavalier to use information contained in the report for impeachment purposes. In light of the potential for undue prejudice, the district court's exclusion of the report did not constitute an abuse of discretion. *See* Fed.R.Evid. 403; *see also Carter v. Burch,* 34 F.3d 257, 265 (4th Cir.1994) (probative value of letter opinion substantially outweighed by danger of unfair prejudice because opinion "decided the precise issue before the jury ... thereby making it likely that the jury would have placed undue weight on such evidence.").

▮ Cavalier next contends that the district court improperly admitted testimony from Martin's expert witnesses as to Martin's psychological symptoms and personality traits. "[T]he trial court has broad discretion in determining whether to admit expert testimony and should not be reversed absent a clear abuse of discretion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989) (quoting *Friendship Heights Associates v. Vlastimil Koubek,* 785 F.2d 1154, 1159 (4th Cir.1986)), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1120, 107 L.Ed.2d 1027 (1990); *see also Persinger,* 920 F.2d at 1187. Cavalier claims that the expert testimony offered here effectively usurped the jury's role by implying that Martin's allegations were in fact true. However, the district court specifically prohibited Martin's experts from offering their opinions as to Martin's truthfulness or Batchelor's guilt; instead, the experts testified only that Martin's personality was such that she might be an "easy victim" and that her symptoms were consistent with those of someone who had been sexually assaulted. Such testimony is appropriate and was properly admitted.[9]

▮ Finally, Cavalier argues that the district court erred by denying its motions for mistrial. Cavalier contends that the brief request by Martin's counsel in opening state-

ment that the jury "listen carefully, and wait for rebuttal witnesses," when those witnesses ultimately never testified, and her direct examination of Batchelor regarding a sexually transmitted disease for which he was tested but never found to have, were grounds for mistrial. However, the jury was properly instructed that counsel's statements were not "evidence in the case" and were to be disregarded; these prompt instructions obviated any possible prejudice. *Bright,* 962 F.2d at 370–71 (court's instruction cured any possible prejudice resulting from counsel's improper remarks to the jury). Accordingly, the district court's denial of Cavalier's motions for mistrial was not an abuse of discretion.

### IV.

▮ Cavalier challenges the district court's award to Martin of $22,320 in back pay. The amount of such an award is left to the discretion of the trial judge, and a Title VII plaintiff is generally entitled to back pay "as a matter of course," *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir.1985) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 420, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)), unless the defendant comes forward with evidence that the plaintiff did not exert reasonable efforts to mitigate her damages. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982); *Edwards v. School Board of the City of Norton,* 658 F.2d 951, 956 (4th Cir.1981) (employer has burden of demonstrating plaintiff failed to mitigate); *see also Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, 719, 98 S.Ct. 1370, 1381, 55 L.Ed.2d 657 (1978) (noting that "[t]he *Albemarle* presumption in favor of retroactive liability can seldom be overcome").

▮ Citing the testimony of Martin's therapist, Cavalier argues that Martin failed to make reasonable efforts to secure other employment in order to mitigate her damages. Martin's therapist testified that al-

---

9. Cavalier also claims that the district court improperly limited its ability to cross-examine one of Martin's expert witnesses regarding certain of his interrogatory responses during discovery. Limitations on cross-examination are generally left to the sound discretion of the district court and will be overturned only where there is clear abuse of that discretion. *Hafner v. Brown,* 983 F.2d 570, 576 (4th Cir.1992); *Withers v. Levine,*

615 F.2d 158, 163 (4th Cir.) (The "[t]rial judge may impose reasonable limits on the extent of cross-examination ...."), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). Cavalier was permitted to examine the witness as to the nature and duration of his professional relationship with Martin and as to the scope of his evaluation, so Cavalier's ability to cross-examine was not limited in any significant way.

though she continually encouraged Martin to seek other employment, Martin declined to do so for no apparent reason. On the other hand, both Martin and her treating physician testified that she was unable to work during this same period. The district judge, who was able to view the witnesses and their demeanor, did not abuse his discretion in believing Martin and her treating physician rather than her therapist and holding that Cavalier had failed to rebut the presumption in Martin's favor. *See Wells v. North Carolina Bd. of Alcoholic Control,* 714 F.2d 340, 342 (4th Cir.1983) ("plaintiff's own testimony" of back pain sufficient reason for failure to maintain employment), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 176 (1984).

## V.

 Finally, Cavalier contends that the district court's award to Martin of approximately $100,000 in attorney's fees was excessive in light of the total jury award of $102,000. Martin cross appeals, contending that this award, which was less than half of her claimed amount of attorney's fees, and the award of $1,500 for expert fees, which constituted only a fraction of the requested expert fees, were too low. Again, such awards are reserved to the trial court's discretion. *Rum Creek Coal Sales v. Caperton,* 31 F.3d 169, 174 (4th Cir.1994) (noting that "plaintiff 'should ordinarily recover an attorney's fee [under 42 U.S.C. § 1988] unless special circumstances would render such an award unjust' " (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983))). As the district court recognized, in calculating a reasonable lodestar fee, such factors as the nature and extent of the services supplied, the customary hourly rate of compensation, the number of hours expended, the skill required, the complexity of the case, and the success achieved by the plaintiff should be considered. *Id.* at 175 (applying factors articulated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974)). Addressing the issue of attorney's fees, we have stated that:

Such discretionary fee awards are reversed on appeal only if under all the facts and circumstances [the award] is clearly wrong. Because the exercise of discretion in awarding attorneys fees typically is based on first-hand knowledge of the case and factors bearing on the reasonableness of a fee, we will not ordinarily disturb the award even though we might have exercised that discretion quite differently.

*Johnson v. Hugo's Skateway,* 974 F.2d at 1418 (citations and internal quotations omitted).

 Martin was the prevailing party on her claim for constructive discharge and as such was entitled to fees and costs. *Farrar v. Hobby,* —— U.S. ——, ——, 113 S.Ct 566, 573, 121 L.Ed.2d 494 (1992) (plaintiff entitled to fee award as prevailing party under 42 U.S.C. § 1988 so long as plaintiff achieves "at least some" success on the merits); *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 789, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989) (plaintiff is considered prevailing party for fee award purposes under 42 U.S.C. § 1988 if plaintiff prevails on "any significant issue").[10] As Martin points out, this Court has not been reluctant to affirm fee awards in excess of jury awards. *See, e.g., Marryshow v. Flynn,* 986 F.2d 689, 690 (4th Cir.1993) (affirmance of award of $24,892 in fees and costs under 42 U.S.C. § 1988 in case in which only $14,500 in damages awarded). In light of the factors articulated in *Johnson,* the amount of fees awarded to Martin was not excessive.

 Similarly, there was no error in awarding to Martin only one half of her claimed amount of attorney's fees and the reduced amount of expert fees. Fee and cost awards "must be fair and must fully compensate prevailing attorneys," *Daly v. Hill,* 790 F.2d 1071, 1082 n. 15 (4th Cir.1986), but they are not intended to "produce windfalls to attorneys." *City of Riverside v. Rivera,* 477 U.S. 561, 580, 106 S.Ct. 2686, 2697, 91 L.Ed.2d 466 (1986) (quoting S.Rep. No. 1011,

---

**10.** The standard for granting attorney's fees under 42 U.S.C. § 1988 is identical to that under Title VII. *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983); *Hanrahan v. Hampton,* 446 U.S. 754, 758 n. 4, 100 S.Ct. 1987, 1989 n. 4, 64 L.Ed.2d 670 (1980) (per curiam); *Arvinger v. Mayor and City Council of Baltimore,* 31 F.3d 196, 200 n. * (4th Cir.1994).

94th Cong., 2d Sess. 6 (1976)) U.S. Code Cong. & Admin. News 1976, 5908, 5913.

Notwithstanding Martin's argument, the district court's rationale for reducing fees was not in any way contrary to our holding in *Johnson v. Hugo's Skateway*. There, relying on *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), we remanded an attorney's fee award of only $15,654 in a case in which the plaintiff had been awarded $200,000 in damages and plaintiff's counsel had requested almost $138,000 in fees, because it appeared that the reason the trial court had reduced the fee award was that the plaintiff had prevailed on only one count "despite the fact that he received a sizeable verdict and that all three counts arose from a common core of facts." 974 F.2d at 1419 (internal quotations omitted). The experienced trial judge here, in contrast, specifically acknowledged that in *Hensley* the Supreme Court had recognized the concept of attorney's fees awards for all charges arising from a "common core of facts" and had directed that in such a case "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940.

The court below then concluded that "the degree to which Mrs. Martin prevailed and the magnitude of her success is not sufficient to warrant an award of *such a large amount of attorney's fees*" (emphasis added). Specifically, the trial judge found Martin's claimed amount of attorney's fees and expert costs to be excessive in light of what appeared to be overbilling and excessive resources committed to the case by plaintiff's counsel.[11] For example, although the trial court acceded to Martin's counsel's request to award lead counsel fees of $200 per hour, it found that "the novelty and difficulty of the questions raised did not require three lead counsel." The court found "unreasonable" a request for $11,000 for time spent by an attorney in attending trial when that attorney examined no witnesses at trial and had

"no active participation" in the trial. Similarly, the court found "30 hours of the paralegals' time for the purposes of 'jury observation' at trial" to be "excessive" and that there "was no reasonable necessity" for other paralegals to attend 47.5 hours of the trial proceedings. These conclusions were not "clearly wrong" under the facts and circumstances here. *See Goodwin v. Metts*, 973 F.2d 378, 385 (4th Cir.1992) (approving a reduction in attorney's fees under 42 U.S.C. § 1988 because of "overstaffing").

*AFFIRMED.*

---

11. It was asserted that several of the expert witnesses were entitled to fees of $1,000 to $2,000 per day. The district judge, who, of course, presided at trial and observed these experts firsthand, found such fees to be "clearly excessive." Instead, he determined fees of $250 to $300 per day to be the sort of "reasonable" expert fees permitted by 42 U.S.C. § 2000e–5(k). That finding is not clearly erroneous.