**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WILLIAM E. BLACK,
<u>Plaintiff-Appellant,</u>

v.                                                                    No. 98-1294

THE RETIRED OFFICERS' ASSOCIATION,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-97-1127)

Submitted: February 2, 1999

Decided: June 2, 1999

Before NIEMEYER and LUTTIG, Circuit Judges, and PHILLIPS,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

William Michael Holm, REDMON, BOYKIN & BRASWELL,
L.L.P., Alexandria, Virginia, for Appellant. Robert E. Williams,
Christine M. Cooper, MCGUINESS & WILLIAMS, Washington,
D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

William Edward Black appeals from the district court's order granting a motion for summary judgment dismissing his claim against his employer, The Retired Officers' Association ("TROA") for alleged constructive discharge because of his age. [1] Finding no reversible error, we affirm.

Black retired from the Marine Corps in 1968 as a first lieutenant and became active in local chapters of TROA shortly afterward. In 1984, at the age of fifty-six, Black was hired to work in TROA's headquarters as Director of the Council and Chapter Affairs Department. Black's primary responsibility was to coordinate and improve the relations between the national headquarters and the local chapters. This task initially required significant travel (visits to 15-20 local chapters per year), which was an aspect of the job Black greatly enjoyed.

In 1986, TROA's board of directors elected Vice Admiral Thomas Kilcline, USN (Ret.), as president of the organization. Kilcline, who is two years older than Black, had a different vision for TROA. Specifically, he wanted more people from the national headquarters to be involved in the visits to the local chapters. This reduced Black's travel time and increased his administrative duties. In 1992, Kilcline noticed that many of the senior people at TROA were approaching retirement age, and he was concerned that several people might retire at the same time, thereby creating a leadership vacuum. In an effort to "space out"

_____

[1] Although Black initially raised several other claims, by the time of the motion for summary judgment, the only remaining claims were for constructive discharge and retaliatory discharge. Black only appeals the district court's decision granting summary judgment on his constructive discharge claim.

the retirements, he began asking senior personnel, including Black, about their retirement plans. Black informed Kilcline that he was not sure about his plans because he was waiting for the real estate market to improve. Kilcline again approached Black in 1993 about his retirement plans; this time asking for a more definitive date. When Black did not provide one, Kilcline reported a tentative date of Spring 1996. In May 1995, Kilcline offered Black a severance package which would allow him to formally retire at TROA's national convention in the fall. Black turned down the offer. During the meeting, Kilcline, who was also planning to retire, made comments to the effect that he and Black were "the last of the dinosaurs," and he suggested that the organization needed younger people with new ideas. **2**

Kilcline retired in June 1995, and TROA's board of directors elected Lieutenant General Michael Nelson, USAF (Ret.), to replace him. Nelson told Black that he was aware of problems between Kilcline and Black, but that he planned to "wipe the slate clean" and make his own evaluation.**3** Nelson, who had a background in strategic planning, brought a different focus to TROA. Nelson wanted even more people from headquarters visiting the local chapters. This further reduced Black's travel time. Nelson also formed a team to develop new ways to increase chapter membership. Black was not appointed to this team because Nelson wanted to use different people from different departments in the hope of generating fresh ideas. Finally, Nelson used his secretary to make most of his travel arrangements instead of going through Black. Black alleged that these actions were retaliatory and meant to "freeze him out" because of his age.**4** Black does not allege that Nelson made any ageist remarks or pressured him to retire.

_____

**2** The record reveals that these"younger people" were in their fifties and early sixties.

**3** Kilcline had criticized Black for what he perceived to be Black's poor organizational and managerial abilities. While Kilcline told Black that his field work was excellent, he felt that Black needed to improve his administrative skills.

**4** We further note that Nelson expressed some of the same concerns as Kilcline regarding Black's administrative skills and recommended ways Black could improve.

In September 1995, Black filed a formal charge of discrimination with the Alexandria, Virginia, Office of Human Rights and the EEOC, alleging that TROA discriminated against him because of his age from May 1995 through August 1995. The allegations focused primarily on Kilcline's alleged comments and actions. Black amended his charge in January 1996 to include a claim for retaliation.

Black collapsed at work in February 1996 after experiencing chest pains and shortness of breath. He was treated at a nearby hospital and released the next day. Black's doctor submitted a note stating that Black's condition was caused by job-related stress and that Black would be out of work for an indefinite period of time. Black initially was allowed to use his accrued sick and annual leave during his absence. During this time, Black continued to receive his full pay and benefits. By July 1996, Black had exhausted his accrued leave and went on a leave-without-pay status, and he eventually received long-term disability payments. Despite repeated requests, Black never informed TROA when, or even if, he intended to return to work. In November 1996, TROA sent Black a letter requesting that he advise them of his intentions by the end of the month and informing him that failure to do so would result in his termination. Black did not respond to TROA's request, and TROA terminated him on December 26, 1996.[5]

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, we must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. See Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). We review a grant of summary judgment de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). We conclude that the dis-

_____

[5] The termination was effective December 2, 1996. We note that during his absence, TROA kept Black's position open. Although a deputy director from another department was assigned to assume Black's duties while he was gone, no one was permanently hired to fill Black's position or the position vacated by his temporary replacement until after Black's termination.

4

trict court properly granted the TROA's motion dismissing Black's claim of constructive discharge because of his age.

Black's claim of constructive discharge centers on the allegedly job-related "heart incident" of February 1996, which required him to go on sick leave from which he never returned.

In this circuit, to prove a claim of constructive discharge, an employee must show that (1) he quit his employment, (2) because of intolerable working conditions, (3) resulting from a deliberate effort by the employer to force him to quit. See Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995). TROA contends that Black has failed to establish a triable issue as to any of these elements. Because we conclude that he failed to create a triable issue respecting the intolerability of his working conditions, we affirm the grant of summary judgment on that ground without addressing the other two: that he "quit" his employment and that TROA deliberately sought to create intolerable conditions.

Whether working conditions are "intolerable" for constructive discharge purposes is assessed by an objective standard of whether a "reasonable person in the employee's position would have felt compelled to resign." See Martin, 48 F.3d at 1254. Black cannot show intolerability simply by showing that he felt compelled to resign, or even that resignation was his best option. See Blistein v. St. John's College, 75 F.3d 1459, 1468-69 (4th Cir. 1996). His specific allegations of intolerable conditions can be divided into four categories: ageist remarks and pressure to retire by Kilcline; work overload; reduction in travel; and "by-passing." Viewing the facts in the light most favorable to Black, we conclude that none of these, separately or together, rise to the level of intolerable working conditions. The identified comments and actions by Kilcline occurred more than eight months before Black's heart incident. Assessed objectively, the work load described by Black could not be found oppressive or unmanageable. Many employees have to work under deadlines or in short-handed work-forces. Many employees are able to tolerate jobs where they never travel at the employer's expense. Finally, it cannot be thought oppressive for a chief executive to have his secretary rather than a department head make his travel arrangements. In short, we conclude that, as a matter of law, the conditions Black complains of

5

were not so intolerable that a reasonable person in his position would have felt forced to resign.

Accordingly, we affirm the district court's order. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

6