**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DIETER HUPPENBAUER,
Plaintiff-Appellant,

v.

No. 95-1032

THE MAY DEPARTMENT STORES
COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-94-635)

Argued: December 4, 1995

Decided: October 23, 1996

Before WIDENER, ERVIN, and WILKINS, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Ervin wrote the opinion, in
which Judge Widener and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** John Wyeth Griggs, GRIGGS & ADLER, Reston, Vir-
ginia, for Appellant. Ronald John Dolan, THE MAY DEPARTMENT
STORES COMPANY, St. Louis, Missouri, for Appellee. **ON
BRIEF:** Debra B. Adler, GRIGGS & ADLER, Reston, Virginia, for
Appellant. Mary V. Schmidtlein, Office of Legal Counsel, THE MAY
DEPARTMENT STORES COMPANY, St. Louis, Missouri; David

D. Hudgins, Jacqueline E. Bennett, HUDGINS, CARTER & COLE-MAN, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

ERVIN, Circuit Judge:

Deiter Huppenbauer, a former shoe salesperson in the Hecht's Department Store ("Hecht's") (owned by the May Department Stores Company), claims that Hecht's failed to honor his request for reasonable accommodation, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. He also claims that Hecht's did not pay him what he was owed under his employee compensation contract. At trial, after Huppenbauer's case-in-chief, the district court found insufficient evidence to support a reasonable jury verdict in his favor and entered judgment against him on both claims. Huppenbauer now challenges that dismissal and certain related evidentiary rulings. We affirm.

I.

Deiter Huppenbauer, in his late 50's, suffers from a number of health problems, including coronary artery disease, cirrhosis of the liver, gout, and arthritis. In 1984, he had a heart attack and underwent coronary artery bypass surgery. After the surgery, the heavy trays and late nights of his restaurant job became too taxing, and Huppenbauer found a job as a furniture salesman. He was later fired by the furniture store and remained unemployed for a time before being hired to work in the ladies' shoe department of Hecht's in July 1990.

At the outset, Huppenbauer assured the Hecht's interviewer that his "health was good," and that he was able to do the job. He also signed an application form stating that he had no condition which would

2

impede his job performance. However, Huppenbauer found the position strenuous. As many as 200 times per day, Hecht's shoe salespeople must go in and out of the stock room to retrieve shoe samples, often from high or low shelves, and must get on their knees to try shoes on customers. The salespeople spend most of their day on their feet and must walk quickly on busy sales days. In addition to serving customers on the sales floor, Hecht's requires the sales associates to spend about an hour per day performing "normal stock work," that is, carrying shipping cartons into the stock room, unpacking them, organizing and stocking the shelves, and cleaning the stock room. At times, the commissioned salespeople are assigned"special stock work," which takes them away from the sales floor for extended periods.

Huppenbauer claims to have spent an inordinate amount of time doing stock room duties, which he found to be very demanding. He carried heavy cartons of shoes to his assigned section on the stock room's second floor and often had to reach up high or get on his knees to restock the shelves. He claims that "expediters," employees assigned to assist with heavy lifting, were generally not available to help him.[1] He describes the stock room as poorly ventilated and permeated with chemical and other foul odors.

Huppenbauer claims that, although his health was good when he came to Hecht's, the stock room work made him sick. During the early period of employment, Huppenbauer performed well, even earning the company's highest "diamond star" sales award. During 1992, however, his performance declined and his absences increased. Huppenbauer claims that the heavy lifting and fumes caused him chest pain, headaches, dizziness, and difficulty breathing. He began visiting doctors more frequently, and was diagnosed with arthritis, gout, and cirrhosis of the liver. In April 1992, he was admitted to Reston Hospital with chest pain. During June, July and August of 1993, he missed a significant amount of work. In September 1993, he was threatened with termination for low sales and his "diamond star" commendation pin was taken from him.

_____

[1] There is no evidence that Huppenbauer ever sought increased access to or special assistance from these "expediters."

3

Huppenbauer claims that the Hecht's management knew about his condition and his difficulties with stock room work. He claims that his condition was common knowledge and that he discussed his health problems and his need for accommodation with Hecht's management. In contrast, Hecht's denies that it was aware of Huppenbauer's claimed disability.

From September 15, 1993, through October 7, 1993, and from October 14, 1993, to October 20, 1993, Huppenbauer was excused from work by his medical clinic. On October 14, 1993, Huppenbauer's physician diagnosed a hernia, purportedly caused by lifting heavy boxes in the stock room. After that visit and upon the doctor's recommendation, Huppenbauer filed an application for extended medical leave. Huppenbauer never returned to work after October 12, 1993; however, according to Hecht's, Huppenbauer was never fired and is still considered an employee.[2]

On October 20, 1993, Huppenbauer brought eight causes of action against Hecht's in the district court. After two of those claims were dismissed, he filed an amended complaint alleging six causes of action. In addition to the ADA and contract claims, he alleged Fair Labor Standards Act violations, national origin discrimination, age discrimination, and intentional infliction of emotional distress. The national origin discrimination claim was dropped before trial. At trial, the district court excluded evidence of Huppenbauer's hernia and evidence pertaining to a front pay remedy. At the conclusion of Huppenbauer's case-in-chief, the May Company moved for a judgment as a matter of law under Fed. R. Civ. P. 50(a). The court granted the motion as to all five active claims, and dismissed the case. This appeal followed.

---

[2] Paragraph 16 of Huppenbauer's Amended Complaint conceded his total disability: "Mr. Huppenbauer has been rendered totally disabled and has been unable to work in any capacity." (J.A. at 38). On February 7, 1994, his attending physician [Dr. Nguyen] wrote a letter stating that in his opinion "Mr. Huppenbauer is no longer capable to carry out the current physical activities that were required for his job as a shoe salesman" at Hecht's. (J.A. at 436). He has not worked anywhere since taking his medical leave in mid-October, 1993.

4

II.

The granting of motions under Fed. R. Civ. P. 50(a)(1) is reviewed de novo. Malone v. Microdyne Corp., 26 F.3d 471, 475 (4th Cir. 1994). The reviewing court must examine--viewing the evidence in the light most favorable to the non-moving party--whether the record as a whole presents a sufficient evidentiary basis for a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

III.

Huppenbauer claims that Hecht's violated the ADA by denying his request for reasonable accommodation that would have allowed him to continue working as a salesman. The ADA prohibits discrimination

>against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). As construed in the ADA, "discrimination" includes:

>not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .

42 U.S.C. § 12112(5)(A) (emphasis added). After Huppenbauer presented his evidence, the district court concluded that he had failed to show that he made an actual claim for accommodation, so that his disability and need for accommodation fairly could be said to be "known" by Hecht's. We agree.

When asked if he had ever supplied any documentation to Dorsey Lilley, the Director of the Human Resources Department, or to anyone else in that Department, specifically explaining his health problems, Huppenbauer conceded that he had not. Huppenbauer also

5

concedes that, although his main treating physician was aware of his stock room work, over his three years of employment no doctor ever wrote a note for him to give to Hecht's that said that he could not perform his duties at work until his final leave of absence. In fact, notes written from his doctors stated that he could resume participation in work and placed no restrictions on his activities. Nevertheless Huppenbauer argues that he gave sufficient notice to Hecht's of his "disability" on a number of occasions. We address each of his assertions to this effect in turn.

A. Initial Employment Interview

Huppenbauer claims that he informed Hecht's about his disability during his job interview.

> I told Miss King that I left the restaurant business because of my heart condition, I could not any longer do heavy lifting, trays and so forth and work until 2 and 3 and 4 in the morning, and that's why I changed and went first into sales as a furniture salesperson and that's why I was looking at this point for a sales position.

(J.A. at 103).

> It was my belief that at the time when I talked to Miss King that I mentioned, because of my heart, because of my heart surgery, it wouldn't prevent me from working. In fact, the doctor recommended certain movements, which doesn't mean heavy lifting. I don't know if I faced this the right way, but I thought I told Miss King that I had a heart condition five years ago. And I was under the impression that Miss King had somebody in her family who had a similar problem. Miss King apparently denies it. It was just my impression. I put a little bit heart and feeling in and said, I have been a year unemployed, I can work, I performed a nice, excellent job as a salesperson, I don't see much difference between selling larger items as furniture or selling beautiful small shoes.

6

(J.A. at 118-119). Huppenbauer alleges that King failed to adequately explain the job requirements to him. Eager to be employed again, he assured King that he was willing and able to do the job, and he signed an application form stating that he had no disabling condition that would impede his job performance. Had he known of the strenuous stock room duties involved, Huppenbauer claims, he would not have applied for the job.

Huppenbauer cannot reasonably be found to have made his disability known to Hecht's during the interview. Most obviously, such a finding conflicts with Huppenbauer's testimony that his "health was good" and he "did not have anything that prevented [him] from taking th[e] job at Hecht's." (J.A. at 117). Huppenbauer's theory of the case is that the stock room work caused him to require accommodation. His description of the interview reveals that he was eager to be hired and to convince the interviewer that he would be able to do the job. In that context, the mere statement that he "had a heart condition five years ago" cannot constitute notice that he had a disability requiring accommodation.

B. General Knowledge Among Hecht's Employees and
        Management

Huppenbauer contends his "heart condition" was common knowledge at Hecht's:

> At one point or the other I am sure that 100 percent of the people that worked over there, unless they were only there one or two days or one week, I am sure that everybody knew that I had a heart condition.

(J.A. at 119). Of course, even if "everyone" knew that Huppenbauer "had a heart condition," such knowledge would not equal notice to Hecht's that the condition imposed limitations on Huppenbauer requiring special accommodation.

C. Emergency Room Incident

Huppenbauer contends that Hecht's was put on notice of his disability when, in 1991, he collapsed on duty and was rushed to the hos-

7

pital. In support, Huppenbauer submitted emergency room records. (J.A. 490-92). But those records do not support Huppenbauer's argument. In fact, they indicated that he had no chest pain, that he smelled strongly of alcohol, and that he had a blood alcohol level of .12. Huppenbauer denied that he had been drinking that day. (J.A. at 122). He does not dispute that he was released and returned to work the same day. Certainly, the incident did not constitute valid notice to Hecht's that Huppenbauer had heart disease requiring accommodation.

D. Requests to Kofteci

Huppenbauer claims that he went to his immediate supervisor, Serra Kofteci, and asked her to lighten or alter his stock room duties.

> Some times in 1993 I showed Miss Kofteci a letter from Dr. Schufler (sic) from Reston Hospital . . . . I went to Miss Kofteci, and to her office and I told her, Miss Kofteci, I am not feeling well, this stock room is killing me. I said, I got a letter here, I don't think you are interested in all four pages, why don't you read just this here. And then maybe you give me a part-time job or easier job where I can do that. And I showed her specifically, five, six lines, here . . . . He (Dr. Shukla) attributes this dizzy spells and angina to this work environment.

(J.A. at 124-25).

Huppenbauer testified that shortly afterward, Kofteci assigned him to "lighter, different janitorial work in the stock room and on the sales floor since the cash registers are on the sales floor." However, about eight or ten days later, Huppenbauer was returned to his regular stock room work. (J.A. at 124-26).

In July 1993, after Huppenbauer returned one week late from a vacation, Kofteci assigned him a larger section of the stock room.

> Well, I told her it keeps me away from the sales floor, it hurts my health, and I would really like to be transferred either to men's shoe department perhaps at the same store

8

> or to the furniture department. And I did this on two occasions. And my request was denied.

(J.A. at 127).

> So, I did more and more stock room work. And I complained to Miss Kofteci. And I told Miss Kofteci because of that stock room work, you know I am selling less. And it makes me more sick and I am taking more days off than I am supposed to be off that sales floor.

(J.A. at 130).

This testimony simply does not indicate that Huppenbauer made a request for accommodation based on a disability. First, the statement indicates Huppenbauer's primary concern with being taken from the sales floor, rather than with the stock room's effect on his health. Second, by asking to be transferred to the men's shoe department, Huppenbauer undermines his entire claim. Presumably, the men's shoe department also has a stock room, filled with even heavier boxes of shoes. An offhanded reference to his health cannot rescue this request for Huppenbauer.

E. Conversations With Upper Management

Huppenbauer claims that he also approached Hecht's managers about changing his job assignments, transfer or part-time status.

> One day I approached a manager who was above Miss Kofteci, her name was Andrea Rosenfeld. And I talked to one other person, but first I think I went to Miss Rosenfeld . . . . It was in September I think . . . . I asked her [Rosenfeld] if she could help perhaps being transferred or getting part-time job at the ladies' shoe department . . . . Her reply was since it was past 10 o'clock in the evening, I think the store was open until midnight that day, she said, Erich, I am too busy at this point, I ask you a favor, please, we are short already and I know you have problems, I showed her some medication I was taking that day, she said, I know you have

9

problems, but please stay to the end and tomorrow or if Serra Kofteci is off tomorrow, the day after, I will talk to her and see if I can help you to get an easier position with this company. However, I never got any reply.

(J.A. at 131-32).

> I talked to Miss Lilley . . . Director of Human Resources . . . [a]round the same time. Everything must have happened in August, September or shortly before I was forced to leave. . . . I first explained the problems I was having with my health on a daily basis, especially chest pain and especially gout. And I explained that I, that more and more I have this gout and arthritis. And we had a quite friendly conversation. She recommended a medication, some shots that she probably had before, it is called cortisone I think. You get it for muscle relations, for strong pain. I said maybe I do it, maybe I don't. I don't like needles and shots too much.
>
> And I said, what can I do to probably get a transfer. As far as I know, Miss Lilley informed me that it would mean a drop in salary to approximately $7.50. As far as I know, I said, I am going to think about it. When I talked about transfer--I mean, I talked about part-time, I again got referred to Miss Kofteci.

(J.A. at 132-33).

When asked if he ever presented any evidence to Lilley or the Human Resources Department concerning his health, Huppenbauer replied:

> Only documents which showed that I was excused for I think six or seven days or so forth to further evaluations were made, but not directly saying that -- . . . . No, just general excuses for some days I may have missed.

(J.A. at 134). Huppenbauer's testimony indicates that his conversations with the Hecht's managers cannot reasonably constitute notice

10

of his limitations and requests for accommodation. During their conversation at 10:00 p.m., Rosenfeld clearly indicated to Huppenbauer that it was not a good time and she was unable to discuss the matter. While Lilley discussed the possibility of transfer, Huppenbauer admits that he told her that he would think about it. That conversation cannot be considered an actual request for accommodation.

F. Request for Medical Leave

From September 15, 1993, through October 7, 1993, and from October 14, 1993, to October 20, 1993, Huppenbauer was excused from work by his medical clinic. On October 14, Huppenbauer's physician diagnosed a hernia, purportedly caused by lifting heavy boxes in the stock room. After that visit and upon the doctor's recommendation, Huppenbauer filed an application for extended medical leave. In his opinion accompanying the request for medical leave, Dr. Nguyen stated that Huppenbauer was still able to work, but"only as a sales associate." Huppenbauer never returned to work after October 12, 1993. He claims that because his personal effects were cleared from the stock room when he went to deliver his medical leave form, he concluded that he had been terminated.

When Huppenbauer requested medical leave in October 1993, he checked on the form that the purpose of the leave he was requesting was because he was unable to perform the essential functions of his job due to his own serious health condition.

He agreed that at that time he was unable to continue working.

> Yes. And I think so stated my doctor, because I could not any longer move upstairs. I could hardly get on public transportation. I could hardly get into a car. I could hardly move because I had a serious hernia, not a small thing that you can walk around with for years. That thing, I am sorry there are ladies here, so far this thing was showing, it was that big.

(J.A. at 183).

To establish a valid claim under the ADA, Huppenbauer was required to submit evidence that (1) he had a recognized disability;

11

(2) that he was otherwise qualified for the job; and (3) that his employer failed to reasonably accommodate his disability. Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994). Assuming without deciding that Huppenbauer met his burdens of proof in establishing that he did have a recognized disability and that he was otherwise qualified for the job, it is clear that he failed to show either that he had made a request for an accommodation or that Hecht's had actual or constructive knowledge of his disability or of his need for an accommodation. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." Movisky v. Broward County, 80 F.3d 445, 448 (llth Cir. 1996).

As the Seventh Circuit explained:

> However, unlike with race or sex discrimination, there are situations in alleged disability discrimination cases where an employer clearly did not know and could not have known of an employee's disability. We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. This is supported both by simple logic and by the conclusions of other courts that have considered analogous issues.

> At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason.

Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995). The Sixth Circuit reached a similar result in Landefeld v. Marion General Hospital, 994 F.2d 1178 (6th Cir. 1993).

The same should be true where an employee failed to make a clear request for an accommodation and communicate it to his employer. Lyons v. Legal Aid Soc., 68 F.3d 1512, 1515 (2nd Cir. 1995). Morisky v. Broward County, 80 F.3d 445, 447, 448 (11th Cir. 1996). Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

12

Larson v. Koch Refining Company, 920 F.Supp. 1000, 1004 (D. Minn. 1996). (holding providing accommodation is only appropriate where the employer knows that the Plaintiff is disabled and is in need of accommodation).

For these reasons, the district court did not err in granting Hecht's motion for judgment as a matter of law on Huppenbauer's ADA claim.

IV.

Huppenbauer also contends that the district court erred in directing a verdict against him on his breach of contract claim. We disagree.

Huppenbauer asserts that he worked over 2,000 hours in the stock room for which he was unpaid. As a result, he lost time working on the sales floor, which at the average hourly rate equals approximately $21,000. He bases this figure on a log which he prepared in January 1994, three months after he stopped working at Hecht's. (J.A. at 187). He admits that the log was prepared from "calendars from Hallmark, United Virginia Bank, other banks, sales slips, piece of papers, [and] cash register readings," all of which he subsequently destroyed. (J.A. at 175-6).

This breach of contract claim is based solely on Hecht's Commission Compensation Information Sheet, which provides for payment for "special stock work assigned by senior management." (J.A. at 393). Huppenbauer, however, offered no proof that his 2,000 hours consisted of "special work" or that it was assigned by "senior management." He simply says that the hours were for normal stock room duties and that they caused him to be off the sales floor, thereby adversely affecting his ability to earn more commissions. Hence, Huppenbauer has failed to show that he was not paid precisely as he should have been. There is no evidence to suggest that Hecht's did not properly compensate Huppenbauer or that Hecht's breached any employment contract with him. The district court acted correctly in rejecting this cause of action.

V.

Finally, Huppenbauer challenges two of the district court's rulings on evidence. These determinations are to be reviewed for abuse of

13

discretion. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1357 (4th Cir. 1995).

A.

Huppenbauer argues that the district court should have allowed evidence concerning his hernia, which he says was caused by the strenuous stock room duties. At trial, Huppenbauer argued that the hernia showed that the stock room work was onerous and had adverse health effects on him. The judge excluded the evidence, finding that it was irrelevant to the issue of whether Huppenbauer had a disability requiring accommodation. (J.A. at 195). The judge viewed the hernia as an injury on the job, not a disability for which Huppenbauer was entitled to relief on the ADA claim.

We agree that the hernia evidence was irrelevant to the ADA claim. Huppenbauer never claimed that his hernia was a disability requiring accommodation. Evidence concerning hernia might be relevant to a negligence or worker's compensation claim, but does not assist in the analysis of an ADA claim. The district court correctly ruled that:

> You have got to have a condition for which you put people on notice that they have to accommodate you. That is what the law is about. This is not a law that prevents you from being injured on the job.

(J.A. at 196).

In his brief, Huppenbauer newly argues that evidence pertaining to his hernia--when it occurred and that it was surgically corrected--should have been admitted as relevant to Huppenbauer's status as a qualified individual prior to October 12, 1993. That argument, which was never presented to the trial court, feebly supports the admission of some hernia-related evidence. But because the connection is extremely weak and because Huppenbauer did not focus on his status as a qualified individual at trial, he could not possibly have been prejudiced by the exclusion of the evidence.

B.

Huppenbauer contends that the trial court improperly excluded the testimony of Dr. Richard J. Lurito, an economic expert scheduled to

14

testify regarding Huppenbauer's future lost earnings. The equitable remedy of front pay is generally available when an employer unlawfully terminates an employee. <u>Duke v. Uniroyal, Inc.</u>, 928 F.2d 1413 (4th Cir. 1991). Front pay is awarded in place of reinstatement because of residual hostility. The court correctly found that Huppenbauer had failed to establish any evidentiary basis for a front pay remedy.

> I don't have any evidence of that in this case. I don't have any evidence of hostility. In fact, he testified as to how he was doing on the job. And I don't see any animosity or any problem of him going back to the job. I don't see any of that in this case. (J.A. at 271).

> . . . if somebody is now disabled and you are talking about front pay, he isn't entitled to front pay all through his disability since they didn't assuming they didn't accommodate him back in whatever date you allege. I am not sure what date you allege in this whole process that they refused to accommodate him. But if they had accommodated him and now he comes up and he is disabled, you are only talking about pay between the date they didn't accommodate him and the time he became disabled, aren't you? (J.A. at 272).

> The ADA remedy is not a gift. It is to compensate somebody who is able to work and has been prevented from working. You have got evidence here that your man now can't work. You can't get pay when you can't work. (J.A. at 273).

> I don't think that you have got anything in this case right now that gives you pay except from the time that you allege that he was not accommodated and the time that he became disabled, because that's what you have shown as his working period. I find that there is not evidence in the case that his working caused his disability. (J.A. at 264).

The district court did not abuse its discretion in excluding either the hernia or the "front pay" evidence on the facts of this case.

15

VI.

The decision of the district court dismissing all of Huppenbauer's causes of action should be and it is hereby

AFFIRMED.

16