Robert GUY, Plaintiff-Appellant,

v.

TRAVENOL LABORATORIES, INC.,
Defendant-Appellee.

No. 86-2553.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 13, 1986.

Decided March 4, 1987.

Phillip Gregory Kelley (Lentz, Ball & Kelley, P.A., Asheville, N.C., on brief) for plaintiff-appellant.

Philip Marshall Van Hoy (Mullins & Van Hoy, Charlotte, N.C., Maynard, Youngs, Associate Gen. Counsel, Deerfield, Ill., Travenol Laboratories, Inc. on brief), for defendant-appellee.

Before ERVIN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

WILKINSON, Circuit Judge:

Robert Guy brought this wrongful discharge action after being fired from his supervisory position at Travenol's North Carolina drug manufacturing plant, allegedly for refusing to falsify certain production and control records. Travenol denied those allegations in its answer and responded that, under North Carolina's doctrine of employment at will, an employer may fire an employee for virtually any reason. The district court granted defendant's motion to dismiss for failure to state a claim under North Carolina law. We think the district court properly interpreted North Carolina law, and we affirm its judgment.

I.

In his complaint, Guy alleged that Travenol employees were falsifying certain records "pertaining to the quality and quantity" of pharmaceuticals that drug manufacturers are required to keep under the Food and Drug Administration regulations. 21 C.F.R. § 211.180–198. Falsification of these records may violate the Food, Drug, and Cosmetic Act. 21 U.S.C. § 301, et seq. (1972). When Guy allegedly notified his supervisors that they were violating federal law, he was told to cooperate. When he allegedly refused to falsify the records to exclude wasted and defective drugs, he was fired. Travenol denies these allegations. Because the complaint was dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, however, these alleged facts must be accepted as true. In his prayer for relief, plaintiff claims compensatory damages of $12,138 and punitive damages of $1,000,000.

II.

Federal courts must consider the availability of any wrongful discharge suit in North Carolina against the backdrop of North Carolina's manifest commitment to the doctrine of employment at will. The North Carolina Supreme Court first recognized the doctrine in the 19th century and has reaffirmed its contemporary vitality. The state Supreme Court has applied it even in cases where the employer had indisputably offered permanent employment. Its cases admit but two exceptions, neither of which is applicable here.

In its pristine form, the doctrine of employment at will permits an employee to be discharged for almost any reason. As a matter of tort law, the doctrine precludes an action for wrongful discharge. *Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 139 S.E.2d 249, 251 (1964); *Miller v. Ruth's of North Carolina, Inc.*, 69 N.C.App. 672, 318 S.E.2d 2, 4 (1984). As a matter of contract law, the doctrine precludes the unilateral representations of an employer from forming part of the contract of employment. *Smith v. Monsanto Co.*, 71 N.C.App. 632, 322 S.E.2d 611, 613 (1984); *Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403, 406 (1971).

The doctrine of employment at will apparently began in *Edwards v. Seaboard R.R. Co.*, where the court stated that an employee and employer were free "to sever

their relationship at will, for their own convenience." 121 N.C. 490, 28 S.E. 137, 137 (1897). During the following ninety years, the North Carolina Supreme Court has continuously accorded employers broad freedom in employment decisions. For example, when an employer offered an employee a "regular permanent job", the court found an at will employment relationship. *Malever v. Kay Jewelry Co.*, 223 N.C. 148, 25 S.E.2d 436, 436 (1943).

Even where an employer agreed that an employee would "have a permanent job as long as (his) work was satisfactory," the court again found the employment to be at will. *Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 139 S.E.2d 249, 250 (1964). On one occasion, an employee was told that, if he wanted to make a career with the company, he had to attend a three-week training session out of town. Five days after arriving at the session, the employee was fired without cause. The court said that the employment was terminable at will, even if the employer had offered a job "upon a permanent basis." *Howell v. Commercial Credit Corp.*, 238 N.C. 442, 78 S.E.2d 146, 147 (1953).

The North Carolina Supreme Court summed up the doctrine when it said "a contract of employment, even though it expressly refers to the employment as 'a regular, permanent job,' is terminable at the will of either party irrespective of the quality of performance by the other party." *Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403, 406 (1971). North Carolina continues to adhere to this version of the "at will" doctrine. In its latest case on the subject, the state Supreme Court reaffirmed the settled rule that an "employment contract in North Carolina is terminable at the will of either party." *Presnell v. Pell*, 298 N.C. 715, 260 S.E.2d 611, 616 (1979).

The North Carolina Court of Appeals has built upon the state Supreme Court's strong support for the concept. In one case, the employee handbook provided that laid-off employees would be hired back according to seniority. When the employer laid off some employees with the possibility of recall within the year, it subsequently hired independent contractors and temporary help rather than rehire the idled employees. The court held that the laid-off workers had no cause of action because their employment was terminable at will. *Smith v. Monsanto Co.*, 71 N.C.App. 632, 322 S.E.2d 611 (1984).

In *Bennett v. Eastern Rebuilders, Inc.*, 52 N.C.App. 579, 279 S.E.2d 46 (1981), a union employee was promoted to management. Because of the employee's concern over job security, the employer agreed to demote her to her old position, rather than fire her, if her work proved unsatisfactory. The company subsequently fired the employee without complying with this transfer agreement. Although the employee had explicitly bargained for job security, the court granted only nominal damages, finding that the employer was entitled to demote the employee and then fire her for any reason.

As these cases reveal, the at will doctrine commands long and continued support in the North Carolina courts even in what may appear unusual and extenuating circumstances. The courts of North Carolina have recognized that every adverse employment decision presents a potentially litigable conflict of fact and perception, that the judicial resources of North Carolina should not generally be expended on such matters, and that the freedom of employers to dismiss employees perceived as unreliable or incompetent should not be lightly circumscribed.

█ It is, of course, immaterial whether a federal court sitting in diversity subscribes to North Carolina's choice in this perennial area of state law controversy. The North Carolina Supreme Court has recognized but two exceptions to the doctrine: an employee has a wrongful discharge suit only when he obtains an employment contract of fixed duration or gives some extra consideration, such as a change of residence or the dismissal of a personal injury claim, in return for permanent employment. *Still*, 182 S.E.2d at 405; *Tuttle*, 139 S.E.2d at 251. While Guy alleges not that he was arbitrarily discharged, but that he was discharged for refusal to perform a

wrongful act, his lawsuit cannot be viewed apart from a near-century of commitment in the state of North Carolina to the doctrine of employment at will. Indeed, Guy pleads the very tort and contract claims that the doctrine has always been thought to proscribe.

### III.

Confronted with this body of precedent, Guy relies upon the recent case of *Sides v. Duke Hospital*, which he believes creates a public policy exception to the at will doctrine. In *Sides*, the North Carolina Court of Appeals held that an employer cannot fire an employee for refusing to commit perjury. 74 N.C.App. 331, 328 S.E.2d 818 (1985). As the *Sides* opinion and three subsequent appellate cases recognize, this decision created only a narrow public policy exception to the doctrine of at will employment. Because it is a limited exception, most readily explained as an exercise of the judiciary's supervisory powers over the proper conduct of court proceedings, *Sides* does not provide Guy with a viable cause of action.

In *Sides*, a nurse alleged that she was fired because she refused to perjure herself both as a deponent and a witness in a medical malpractice case. The court's opinion emphasized the need to prevent perjury and preserve judicial integrity. As the court noted, perjury is "an affront to the integrity of our judicial system, an impediment to the constitutional mandate of the courts to administer justice fairly, and a violation of the right that all litigants in this State have to have their cases tried upon honest evidence fully given." *Sides*, 328 S.E.2d at 823–24. To deny a cause of action in that case would have been a "grave disservice to the public and the system of law that we are sworn to administer." *Sides*, 328 S.E.2d at 824.

Despite some language dealing with the general need to uphold the law and support public policy, the court's holding was very specific: "no employer in this State, notwithstanding that an employment is at will, has the right to discharge an employee ... because he refuses to testify untruthfully or incompletely in a court case." *Sides*, 328 S.E.2d at 826. The holding rests on the belief that the need to protect the judicial process from the perjured testimony of an intimidated witness outweighs the employer's right to fire an employee. This limited exception to the doctrine is not surprising. The courts obviously have a special obligation to promote the integrity and truthfulness of the judicial process.

The *Sides* case is limited, however, by more than its holding and its language. Three subsequent appellate cases reaffirm the narrow scope of that decision. In *Walker v. Westinghouse Elec. Co.*, 77 N.C. App. 253, 335 S.E.2d 79 (1985), the North Carolina Court of Appeals demonstrated its reluctance to expand the *Sides* exception. In that case, an employee alleged that he was fired in retaliation for raising safety concerns relating to the Westinghouse plant. Although North Carolina has a statute protecting employees who file a complaint with the state OSHA commission, N.C.Gen.Stat. § 95–130(6) (1981), the court was unwilling to establish a general cause of action for any employee who raised a safety concern.

The court characterized *Sides* as granting a cause of action to employees "on the grounds that the public policy requiring truthfulness before our courts outweighed the employer's freedom to discharge employees at will." *Walker*, 335 S.E.2d at 85. Although the *Walker* court ultimately concluded that the employee had not presented sufficient evidence to survive the employer's motion for summary judgment, the decision does reveal the court's unwillingness to restrict the "at will" doctrine. *See also Rupinsky v. Miller Brewing Co.*, 627 F.Supp. 1181, 1185 (W.D.Pa.1986) (noting that, in *Walker*, North Carolina Court of Appeals "recently qualified its decision in *Sides*.")

In *Trought v. Richardson*, 78 N.C.App. 758, 338 S.E.2d 617 (1986), a nurse alleged that she was fired for transferring two licensed practical nurses from the emergency room. She claimed that the "at will" doctrine did not apply because in removing the nurses she was following state law,

here the state Nursing Practice Act. The court, however, stated that "we do not believe this allegation is sufficient to come within or enlarge the exception created by *Sides.*" *Trought,* 338 S.E.2d at 619. The *Trought* decision, which the district court in this case found dispositive of the motion to dismiss, held that an employee does not come within the *Sides* exception by alleging that she was fired for attempting to comply with state law.

The North Carolina Court of Appeals continued to limit the new exception in *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116 (1986). In *Hogan,* several female employees claimed that they were fired in retaliation for complaining about the sexual advances of a fellow male employee. The employees argued that *Sides* allowed a wrongful discharge suit whenever an employee is terminated in violation of public policy. *Hogan* quickly rejected this interpretation, noting that "though *Sides* spoke in broad terms of 'public policy,' its holding was actually very narrow." *Hogan,* 340 S.E.2d at 125. While noting that the claim appeared cognizable under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* the court rejected the employees' request to recognize a new public policy exception to the doctrine of employment at will in North Carolina. *Id.,* 340 S.E.2d at 126.*

■ In sum, the *Sides* opinion and the holdings of three subsequent appellate cases reveal that, instead of seriously eroding the at will doctrine, *Sides* was intended to be a limited perjury exception. At this point, the law of North Carolina is well-established. An employer may terminate any employee for any reason unless the employee has a specific duration contract, gave some additional consideration for permanent employment, or lost his job for refusing to give perjured testimony. Be-

cause his complaint does not come within any of these exceptions, Guy has failed to state a cause of action under state law.

### IV.

■ Having failed to allege a cause of action under state law, Guy offers a more expansive argument. According to Guy, this court should create a cause of action because, if employees can be fired for complying with the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.,* they will be more willing to falsify records, which would impair the Food and Drug Administration's enforcement of the Act. Whatever the appeal of this argument, Guy is presenting it to the wrong forum. A federal court sitting in diversity simply cannot compel a state to provide a cause of action in tort to supplement enforcement of a federal statute.

Despite Guy's warnings to the contrary, creating a state recovery in tort is not the only way to protect the public against the sale of impure drugs. Congress has enacted a detailed statutory scheme to enforce the Act's prohibition of the sale of adulterated drugs. Under this scheme, drug companies must manufacture their products in accordance with the FDA's regulations on "current good manufacturing practices." 21 U.S.C. §§ 331, 351(a)(2)(B) (1972). In addition to regulating the actual manufacture of drugs, these regulations require drug companies to keep accurate production and control records. 21 C.F.R. § 211.180–198. To ensure that drug companies comply with these regulations, the Act provides the FDA with broad statutory authority to inspect a manufacturer's plant and examine any "records, files, papers, processes, controls and facilities." 21 U.S.C. § 374(a)(1) (Supp.1986).

---

* *Hogan* does offer some slight support for Guy's position because it characterized *Sides* as creating a cause of action for employees who refuse "to perform an act prohibited by law." *Hogan,* 340 S.E.2d at 126. We do not, however, believe that single sentence to be dispositive. The *Hogan* court was not trying to provide the definitive interpretation of *Sides* or attempting to expand the *Sides* decision—the court was merely

trying to show that the cause of action recognized in that case was something less than a broad public policy exception. In light of the nearly 100 years of employment at will in North Carolina, the language of *Sides,* and the holdings of the three later cases, including *Hogan,* a single sentence in dicta is not sufficient to create a new cause of action for Guy.

If the agency discovers a violation, the Act provides numerous remedies. For example, the FDA may seize the adulterated drugs. 21 U.S.C. § 334(a) (Supp.1986). The agency may also seek an injunction against any manufacturing practice that violates the Act. 21 U.S.C. § 332(a) (1972). Most importantly, producers of adulterated drugs are subject to possible criminal sanctions of up to three years imprisonment and a maximum fine of $10,000. 21 U.S.C. § 333(b) (1972).

In sum, the Food, Drug, and Cosmetic Act establishes a complex enforcement scheme. Under this scheme, Travenol is subject to unannounced agency inspections. The FDA may seize any impure or adulterated drugs, and may seek to enjoin any company practice in violation of the statute. Any Travenol employees who violate the statute by falsifying required records are subject to criminal sanctions.

According to Guy, this federal enforcement scheme is incomplete unless he is allowed to bring a wrongful discharge suit. Because, as we have noted, North Carolina has been reluctant to recognize such an action, Guy is essentially arguing that the state should be compelled to supplement the Act's enforcement scheme by providing a wrongful discharge action. North Carolina, however, has no obligation to use its tort law system to supplement the enforcement of a federal statute. As the Supreme Court has noted, "the State's interest in fashioning its own rule of tort law is paramount to any discernible federal interest...." *Martinez v. California*, 444 U.S. 277, 282, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980) (upholding state statute granting immunity to parole board employees for any injury resulting from their decision to release a prisoner).

Congress itself has declined to pass an anti-retaliation statute to protect employees who refuse to violate the Food, Drug, and Cosmetic Act. Congress was apparently aware of the potential risks faced by employees who refuse to cooperate with an employer's violation of a statute. Several statutory schemes provide that, if an employee is fired for instituting or assisting an agency investigation of a suspected statutory violation, the employee must be reinstated with back pay. *See, e.g.,* Federal Water Pollution Control Act, 33 U.S.C. § 1367 (1986); Federal Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1293 (1986); Energy Reorganization Act of 1974, 42 U.S.C. § 5851.

Congress could have protected Guy by establishing a similar procedure by which drug company employees could notify the FDA of a violation without fear of retaliatory termination. If such a statute had been passed, Guy could have refused Travenol's demand to violate the FDA regulations, reported the violation to the agency, and been protected from a retaliatory firing. Rather than provide this employee protection, Congress has decided to enforce the Food, Drug, and Cosmetic Act through a different statutory scheme. We are loathe to require the states to create a protective scheme in tort where Congress has declined to pass such legislation in furtherance of its own enactment.

The decision to create an additional measure of enforcement through a wrongful discharge action involves a choice between two competing state policies, a choice federal courts sitting in diversity cannot make. One policy, which has its academic champions, is the protection of employees against employer abuse. *See* Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum.L.Rev. 1404 (1967); Summers, *Individual Protection Against Dismissal: Time for a Statute,* 62 Va.L.Rev. 481 (1976). Recognizing the claim here might indeed have salutary consequences. It might protect those employees who follow FDA regulations, prevent unscrupulous employers from forcing employees to choose between holding their job or following federal law, and prevent the sale of impure drugs.

For all these possible benefits, however, a wrongful discharge action may also have undesirable effects. There is a risk that

many employees who are properly terminated will try to claim the exception, particularly those in sensitive drug-related industries such as pharmacies, pharmaceutical companies, doctors' offices, and hospitals. There is a danger that the always uncertain prospects of litigation will deter employers in these industries from legitimate personnel decisions, even with respect to those employees whose continued contact with drugs in the workplace poses a variety of public risks.

The balance between encouraging legitimate claims and discouraging spurious ones is for North Carolina to strike. So also is the balance between employee rights and employer perogatives. This is particularly true in tort and contract law, whose elements of recovery and damages lie at the heart of state, not federal, public policy. When confronted with a request to modify or create a state cause of action, a federal court must recall the Supreme Court's admonition that "where in (diversity) cases one is barred from recovery in the state court, he should likewise be barred in the federal court." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949). The *Erie* doctrine "calls on us to apply state law, not, if we can be persuaded to doubt its soundness, to participate in an effort to change it." *Tarr v. Manchester Ins. Corp.*, 544 F.2d 14, 15 (1st Cir.1976).

The point is as simple as it is unavoidable: in diversity cases, when state law provides an answer, federal courts must abide by that law. North Carolina law does provide the answer in this case: outside of a few restricted limitations that do not apply, an employer may terminate an employee for any reason. Thus, Guy has no cause of action against Travenol. In applying state law, federal courts have always found the road straighter and the going smoother when, instead of blazing new paths, they restrict their travels to the pavement.

The judgment of the district court is AFFIRMED.